1  Robert F. McCauley (SBN 162056)
   robert.mccauley@finnegan.com
2  FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
3  3300 Hillview Avenue
   Palo Alto, CA 94304-1203
4  Telephone:     (650) 849-6600
   Facsimile:     (650) 849-6666
5
   Gerald F. Ivey (*pro hac vice* to be filed)
6  Smith R. Brittingham IV (*pro hac vice* to be filed)
   Elizabeth A. Niemeyer (*pro hac vice* to be filed)
7  John M. Williamson (*pro hac vice* to be filed)
   Aidan C. Skoyles (*pro hac vice* to be filed)
8  FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
9  901 New York Avenue, NW
   Washington, DC 20001-4413
10 Telephone:     (202) 408-4000
   Facsimile:     (202) 408-4400
11
   Stephen E. Kabakoff (*pro hac vice* to be filed)
12 FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
13 3500 SunTrust Plaza
   303 Peachtree Street, N.E.
14 Atlanta, GA 30308-3263
   Telephone:     (404) 653- 6400
15 Facsimile:     (404) 653-6444

16 *Attorneys for Plaintiffs*
   OpenTV, Inc., Nagravision S.A., and Nagra France S.A.S.
17

18                    UNITED STATES DISTRICT COURT

19                 NORTHERN DISTRICT OF CALIFORNIA

20 OPENTV, INC., NAGRAVISION S.A., and          Case No.
21 NAGRA FRANCE S.A.S.

22                Plaintiffs,                    **COMPLAINT FOR
                                                PATENT INFRINGEMENT**
23         v.
                                                **DEMAND FOR JURY TRIAL**
24 APPLE INC.,

25                Defendant.

26

27

28

Plaintiffs OpenTV, Inc., Nagravision S.A. ("Nagravision"), and Nagra France S.A.S. ("Nagra France") (collectively "OpenTV" or "Plaintiffs") for their complaint against Defendant Apple Inc. ("Apple"), allege as follows:

1.      Plaintiffs, members of The Kudelski Group of companies, bring this patent infringement action to stop Apple from continuing its wrongful and unlicensed use of OpenTV's patented technologies for, among other things, storing, providing, managing, delivering, securing, playing, and viewing interactive content on smartphones, tablets, computers, digital televisions, and other devices.

2.      The Kudelski Group and its subsidiaries OpenTV, Inc., Nagravision, and  patent: claim France have a long and distinguished history of innovation, and today these companies design and manufacture widely used, critically acclaimed, and award winning digital media technologies, employ hundreds of employees in the United States and thousands worldwide, and protect their research and development investment with a robust patent portfolio comprising thousands of patents reflecting the efforts of years of innovation and effort by numerous inventors and engineers. Plaintiffs encourage innovation by licensing their intellectual property portfolio, but enforce their patent rights when necessary to protect their research investment and protect the fruits of the efforts of their employees from unauthorized use.

3.      Apple's products and services, including its iOS-based mobile devices (e.g., the iPhone, iPad, and iPod Touch), its Apple TV, iTunes, and App Store products and services, and its OS X-based computers, make pervasive use of OpenTV's patented technology and infringe one or more of the following five United States patents (the "Asserted Patents"):

- 6,148,081 titled "Security model for interactive television applications" ("the '081 patent") (Exhibit A hereto);

- 6,233,736 titled "Media online services access system and method" ("the '736 patent") (Exhibit B hereto);

- 7,055,169 titled "Supporting common interactive television functionality through presentation engine syntax" ("the '169 patent") (Exhibit C hereto);

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

- 7,644,429 titled "Broadcast and reception, and conditional access system therefor" ("the '429 patent") (Exhibit D hereto); and

- 7,725,740 titled "Generating a root key for decryption of a transmission key allowing secure communications" ("the '740 patent") (Exhibit E hereto).

4.     Plaintiffs seek damages in an amount adequate to compensate them for Apple's infringement, a permanent injunction barring Apple from continuing to infringe OpenTV's patents, and attorneys' fees and costs associated with this action.

## I.     JURISDICTION AND VENUE

5.     This lawsuit is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 101 et seq. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.     This Court has personal jurisdiction over Apple because Apple resides and has its primary place of business in Cupertino, California, within this District. This Court also has personal jurisdiction over Apple because Apple has committed, contributed to, and induced acts of patent infringement and has regularly and systematically conducted and solicited business in this District by and through at least its sales and offers for sale of Apple products and services, and other contractual arrangements with Apple subscribers, customers, developers, distributors and third-party service providers using Apple products and services located in and/or doing business in this District.

7.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(b) because Apple resides in this District, has a regular and established place of business in this District, and has committed acts of infringement in this District.

## II.     INTRADISTRICT ASSIGNMENT

8.     This action for patent infringement is assigned on a district-wide basis under Civil L.R. 3-2(c).

## III.     THE PARTIES

### A.     Plaintiffs OpenTV, Inc., Nagravision S.A., and Nagra France S.A.S.

9.     OpenTV, Inc. is a Delaware corporation whose principal place of business in the United States is located in San Francisco, California.

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

10.    Nagravision S.A. is a Switzerland corporation whose principal place of business is located in Cheseaux, Switzerland.

11.    Nagra France S.A.S. is a French corporation whose principal place of business is located in Paris, France.

12.    OpenTV, Inc., Nagravision, and Nagra France are subsidiaries of Kudelski SA. Kudelski SA and its subsidiaries make up the various companies of The Kudelski Group. The history of The Kudelski Group is one highlighted by over 60 years of innovation, award winning products, and loyal, long-term customers who entrust The Kudelski Group with their business. Today, The Kudelski Group is a major employer in the United States, Europe, Asia, and elsewhere, providing jobs in manufacturing, engineering, research and development, marketing, sales, and many other specialties with around 3,000 employees worldwide.

13.    In 1951, Stefan Kudelski created the first company in what became The Kudelski Group and launched the now legendary "Nagra" line of portable recording devices for cinema, TV, and radio recording. Stefan Kudelski's recording devices, and the inventions in them, were considered revolutionary throughout the movie industry. The Nagra devices allowed precise synchronization of audio tape with film, providing filmmakers with studio sound quality during on-location filming.

14.    Throughout his career, Stefan Kudelski received numerous awards and honors for his technological achievements, including four Academy Awards, two Emmy Awards, and Gold Medals from the Society of Motion Picture & Television Engineers, the Audio Engineering Society, Lyra, and Eurotechnica. Mr. Kudelski also was recognized by the FBI for his technology contribution in audio recording. After Mr. Kudelski's death in 2013, he was honored in the "in memoriam" presentation during the 86th Annual Academy Awards in March 2014, described by a single word: Inventor.

15.    The success of the products that The Kudelski Group manufactured and sold in its early years allowed the company to grow and expand. In 1989, The Kudelski Group expanded the scope of its technological innovation by launching its first conditional access systems for pay TV. Over the next decade, The Kudelski Group continued to expand its technology development in the digital television domain, providing global, universally compatible solutions to manage, organize, enhance,

- 4 -

market, and secure digital content, regardless of whether it was transmitted over managed or unmanaged networks, broadcast linearly or on-demand.

16.     Today, digital television is The Kudelski Group's core business. The Kudelski Group has become a world leader in digital security and convergent media solutions for the delivery of digital and interactive content. The Kudelski Group's innovations are continuously contributing to the evolution of the digital television ecosystem, enabling operators to extend their multimedia offerings across the entire digital ecosystem to numerous client devices through traditional managed networks as well as Internet delivery.

17.     Within The Kudelski Group, the principal operating company responsible for developing and implementing innovative solutions for securing digital television content is Nagravision. Nagravision provides innovative solutions for accessing interactive television content and creates innovative security and access control solutions that provide optimal levels of protection throughout the content distribution chain, from creation to consumption. Nagravision products and services include open conditional access systems, digital rights management, and integrated on-demand solutions for content providers and digital television operators over broadcast, broadband, and mobile platforms. Nagravision's technologies are used by over 120 pay-television operators in the United States and internationally to deliver secure television content to a wide range of devices. In particular, Nagravision has been an industry leader in recent years in the development of technologies to secure delivery of paid content to mobile devices or to multiple devices connected by a local wired or wireless network.

18.     The Kudelski Group has also grown as a leader in the digital television domain through acquisitions of pioneering technology companies, including such notable companies as Lysis, Livewire, MediaGuard, SmarDTV, OpenTV, Inc., and most recently, Conax, a global provider of content protection for digital TV services over broadcast, broadband, and connected devices.

19.     OpenTV was founded in 1996 as Thomson Sun Interactive, LLC, a joint venture of Thomson Multimedia SA and Sun Microsystems, Inc. In 1997, Thomson Sun Interactive LLC was converted into a newly-formed corporation—OpenTV, Inc. From its inception, OpenTV, Inc. has been dedicated to developing and commercializing cutting-edge, patented technology required for the

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

1    delivery of television and other media content to consumers through cable, satellite, and terrestrial

2    networks, and other managed and unmanaged networks.

3    20.     OpenTV, Inc., has a long history of innovation in the field of software for set-top boxes for

4    television sets. Within four years of its creation, OpenTV, Inc. became the first interactive television

5    middleware provider to integrate its middleware technology in more than 10 million set-top boxes

6    worldwide—more than all other industry competitors combined. OpenTV, Inc. also partnered with

7    EchoStar's DISH Network, which was the first satellite company to provide interactive television

8    services in the United States. OpenTV, Inc.'s set-top box middleware technologies were key to the

9    successful growth of DISH Network. Today, OpenTV, Inc. has partnerships with companies

10   worldwide, and its middleware has now been incorporated into over 200 million set-top boxes.

11   21.     In addition to its industry-leading set-top box middleware solutions, OpenTV, Inc. has been

12   an innovator in web-based content delivery.

13   22.     As a result of its ongoing commitment to interactive television and web-based content

14   delivery, by 2004-2006, OpenTV, Inc. led the industry in integrating browser software into

15   television sets, built the first interactive shopping application for DISH Network, successfully

16   launched real-time two-way interactive television shopping services on QVC, and provided the

17   technology for CNN Enhanced TV, among other notable achievements. All of these innovations

18   helped to pave the way for the growing revolution in how media content is delivered and enjoyed,

19   including over the Internet.

20   23.     In addition to these achievements, OpenTV, Inc. also developed complementary technology

21   related, for example, to personal video recording ("PVR"), video-on-demand ("VOD"), television

22   home networking, advanced advertising methodologies, and tools for recommending content to

23   viewers. The industry has also long recognized OpenTV, Inc.'s technology contributions. For

24   example, OpenTV, Inc.'s PVR was named as one of the best in its field by Seagate Technology in

25   2009.

26   24.     Today, OpenTV, Inc. develops software that enables intuitive and personalized viewing

27   experiences for consumers. OpenTV, Inc.'s software solutions provide a variety of advanced and

28

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

interactive services for television, including advanced user interfaces, VOD, PVR, high-definition ("HD"), interactive and addressable advertising, and a variety of enhanced television applications.

25.     Plaintiff's products that are integrated with the OpenTV platform have won numerous industry awards, including "Best New Technology" at the 2009 DISH Network Interactive Awards for OpenTV, Inc., "Best Content Protection Technology" for Nagravision's PRM solution at the International Broadcasting Convention (IBC) trade show in 2010, a TV Innovation Award in the category of "Advanced User Interface" for OpenTV, Inc.'s crossdevice user experience in 2010, an IPTV World Forum Award for "Best Multiscreen Solution/Service" for Nagra Multiscreen in 2012, and "Best IPTV Technology" for Nagra MediaLive and "Best Middleware" for OpenTV, Inc. at IBC 2012. Most recently, Nagravision's Gravity user interface, which relies on OpenTV, Inc.'s next generation middleware software, known as OpenTV5, was widely praised following the 2013 International Broadcasting Convention trade show as a stand-out product for showing "how the user interface and the overall user experience can be enhanced with 4K screens," "bring[ing] the HTML5 user experience and 4K to a new level," and for providing a "stunning" and "compelling" user interface.

26.     OpenTV, Inc. became a part of The Kudelski Group in 2007 through The Kudelski Group's acquisition of a controlling stake in the company. OpenTV, Inc. became a wholly-owned subsidiary of Kudelski SA in 2010.

27.     OpenTV, Inc.'s integration into The Kudelski Group has allowed for commercial and technological synergies between other Kudelski Group companies, such as Nagravision and Nagra France, and continued innovation in the delivery of digital content. For example, in 2013 The Kudelski Group introduced JoinIn, a connected home solution that allows users to seamlessly deliver secured premium content across multiple devices within a home, including multiple TV screens and mobile devices such as smartphones and tablets. JoinIn integrates OpenTV5 middleware with Nagravision's security and access control technology.

28.     Through its dedication to developing innovative technologies, OpenTV's technologies have contributed to the explosive growth of content delivery and consumption across all broadband networks, including increased consumption of Internet content by users.

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

29.     OpenTV, Inc. employs more than 200 people in the United States, while The Kudelski Group as a whole, including Nagravision and Nagra France, employs nearly 400 people within the United States.

30.     The Kudelski Group, including its OpenTV, Inc., Nagravision, and Nagra France subsidiaries, devotes substantial resources to research and development. In fact, The Kudelski Group companies have invested over $3 billion in R&D in the past 20 years.

31.     To protect their investment in R&D, OpenTV, Inc., Nagravision, Nagra France, and the other Kudelski Group companies have garnered a robust international portfolio of over 4,400 worldwide pending and issued patents, including many related to the delivery of end-to-end secure media solutions for digital content, and continue to substantially grow their worldwide patent positions in this and other complementary technology areas. Over 1,000 of these patents and applications worldwide belong to OpenTV, Inc., over 1,900 belong to Nagravision, and over 400 belong to Nagra France.

32.     These patents include key technologies related to content management and delivery systems, content recommendation engines and targeted content delivery, subscriber management systems and tools, Digital Rights Management ("DRM") and other content access control techniques, billing and payment systems, user interfaces, digital video recorder ("DVR") content storage and scheduling, end-to-end digital content security, including securing digital content within the home network, VOD content selection, advanced advertising techniques, and many others.

33.     Companies worldwide have acknowledged the commercial importance of The Kudelski Group's patent portfolio, taking licenses relevant to their businesses. Notably, Cisco Systems, Inc. licensed The Kudelski Group's patent portfolio in January 2014, Google licensed The Kudelski Group's patent portfolio in April 2015, and Disney licensed The Kudelski Group's patent portfolio in April 2015.

### B.      Apple Inc.

34.     Apple is a California corporation with a principal place of business in Cupertino, California.

35.     Apple is a major designer and manufacturer of computer technologies, including personal computers, mobile communications devices, portable digital music and video players, and related

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

1   software. Apple was formerly known as "Apple Computer, Inc.," but changed its name in 2007 to

2   reflect a broadened focus on mobile computing devices, computing services, and content delivery as

3   well as personal computers.

4   36.   The company's products and services include:

5   • mobile devices such as the iPhone, iPod Touch and iPad that use Apple's iOS

6   operating systems (collectively, "iOS devices");

7   • personal computers, including desktop computers and laptops such as the "MacBook"

8   line that use Apple's OS X operating system (collectively, "Mac OS X devices");

9   • products to support access to streaming content, such as Apple TV;

10   • a portfolio of consumer and professional software applications, including iTunes, the

11   iTunes Store, the Mac Store, the App Store, the iOS and OS X operating systems; and

12   • a variety of accessory, service and support offerings.

13   37.   Apple first introduced the iPod line of portable media players in 2001, along with the iTunes

14   music service. There are three current versions of the iPod—the ultra-compact iPod Shuffle, the

15   compact iPod Nano, and the touchscreen iPod Touch.

16   38.   The iPhone is a line of smartphones designed and marketed by Apple, first introduced in

17   2007. The iPhone runs an operating system specifically designed for mobile devices, originally

18   designated by Apple as iPhone OS and since renamed iOS. Since releasing the iPhone, Apple has

19   expanded its line of devices running Apple's iOS mobile operating system to include several

20   additional iterations of the iPhone (most recently the iPhone 6 and 6 Plus, introduced in 2014), the

21   iPad line of tablet computers first released in 2010, and multiple versions of its iPod line of portable

22   media players designated under the iPod Touch brand name and operating iOS. Since Apple first

23   introduced the iPhone, Apple has sold the vast majority if not all of its iOS-based products with

24   iTunes pre-installed on the devices.

25   39.   Although Apple dropped the word "computer" from its name in 2007, Apple continues to be

26   a major manufacturer of computers, including both desktop and laptop computers. Apple frequently

27   brands its desktop computers with variants of the "Mac" trade name (for example, Mac Mini, iMac,

28   and Mac Pro), while Apple designates its laptop computers and other portable computers as

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

1   "MacBooks," such as the MacBook Pro and MacBook Air. Apple's current line of computer

2   products includes desktops and portable computers running Apple's OS X operating system.

3   40.    Apple TV is a digital media player developed and first sold by Apple in 2007. It is a small

4   form factor network appliance designed to play digital content from the iTunes Store, as well as

5   third-party applications, on an enhanced-definition or high-definition widescreen television. Apple

6   generates significant revenue from the sale of Apple TV devices as well as content purchased

7   through Apple TV. At a recent Apple shareholder's meeting, Apple Chief Executive Officer Tim

8   Cook noted that Apple had generated significant revenue from Apple TV over the last year,

9   admitting that today, "it's a little bit harder to call it a hobby."

10  41.    Apple iTunes is a media player, media library, and mobile device management application

11  and service developed and operated by Apple. Apple iTunes includes an application installed on

12  personal computers or mobile computing devices, as well as an online service operated by Apple. It

13  is used to play, download, and organize digital audio and video on a variety of Apple devices,

14  including Apple personal computers, mobile computing devices based on iOS, and Apple TV. Apple

15  also makes iTunes available for download for users of a wide variety of computing devices,

16  including computing devices made by companies other than Apple. For example, Apple has offered

17  several versions of iTunes that operate in the Microsoft Windows operating system, and generates

18  additional revenue from purchases made within iTunes by iTunes Windows users. Additionally,

19  Apple has periodically added new features to iTunes and offers new versions of the software to

20  existing iTunes users, in some cases through automatic updates. Through the iTunes Store, launched

21  in 2003, users can purchase and download a variety of content such as music, music videos,

22  television shows, audiobooks, podcasts, movies, and movie rentals, and ringtones. The iTunes Store

23  also includes the ability for users to watch movie previews which are streamed from a remote Apple

24  server to the user's device.  Users can also rent movies from the iTunes Store.  When a user pays to

25  rent a movie, the movie is available for viewing within 24 hours of when they first start watching it.

26  Users can also access "Ratings and Reviews" and "Related" information about songs and podcasts

27  while they are listening to content on the iTunes Store.  Apple has consistently advertised the

28

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

1    interaction between iTunes and its other computing and media products, including Apple computers,

2    the iPod, Apple's mobile computing devices, and more recently Apple TV.

3    42.      In the iTunes Store, content such as Video and apps are protected by Apple using an Digital

4    Rights Management ("DRM") encryption scheme known as "FairPlay." Using FairPlay, Apple

5    encrypts content using a key which is in part specific to the purchasing user. This way, content

6    purchased by a particular user can only be played on one of up to five devices authorized to use that

7    user's iTunes account.

8    43.      A substantial part of Apple's business strategy relies on synergies between different Apple

9    products. Apple designs and markets its products to create a branded, closed "ecosystem" that

10   encourages consumers who use one Apple product or service to use it in conjunction with other

11   Apple products and services. For example, Apple computers and mobile devices direct customers to

12   purchase content from the iTunes store and App Store, while Apple encourages Apple TV customers

13   to stream Apple TV content to their Apple mobile devices using a software feature known as

14   "AirPlay," which can link Apple mobile devices and/or OS X-based computers to a local wireless

15   network and provide encryption methods to secure content being streamed from one Apple device to

16   another.

17   44.      Notably, Apple's recent success from its vast line of products and services has come years

18   after core technologies underlying these products and services were developed by others, including,

19   in the present case, pioneering technologies developed by OpenTV.

20   45.      In addition, Apple's business strategy relies on its sophisticated use of intellectual property,

21   by which it attempts to protect its product ecosystem through the offensive and defensive use of

22   intellectual property, including patents.  Apple is an active patent buyer and seller, and as a

23   corporation, Apple is one of the largest filers of Inter Partes Review petitions with the USPTO.  On

24   information and belief, Apple investigates and evaluates the patent portfolios of companies that

25   assert patents against it.  In this case, for example, Apple raised other, unasserted OpenTV patents as

26   part of its challenge to the validity of an OpenTV patent in Germany. *See* Bundespatentgericht (Fed.

27   Pat. Ct.) BPatG 5Ni51/14 (EP) (filed Dec. 11, 2014). Apple would be aware of a prominent portfolio

28   such as that of The Kudelski Group as this portfolio is well-known in the industry. OpenTV, Inc. has

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

asserted patents from its portfolio where appropriate against infringers. For example, in January

2014, OpenTV, Inc. and Cisco Systems, Inc. successfully ended litigation when The Kudelski Group

and Cisco entered a well-publicized license agreement. Furthermore, Apple and OpenTV, Inc. are

currently involved in ongoing patent litigation in this district.  *See OpenTV, Inc. et al v. Apple, Inc.*,

3:14-CV-1622 (N.D. Cal.). The Kudelski Group has also licensed its patent portfolio in April 2015

to Google, a primary Apple competitor, and to Disney.  Thus, Apple is aware of The Kudelski

Group's portfolio at least by virtue of its role in the market, its licensing activities, the ongoing

litigation, and the impact of The Kudelski Group's portfolio on Apple's products. As a sophisticated

consumer of intellectual property, Apple would have known, or should have known, of the patents

now at issue in this case.

## IV.      BACKGROUND OF THE TECHNOLOGY

46.      The technology at issue in this case generally pertains to the field of securely communicating

data between devices and communicating large amounts of information such as streams of digital

video information or app data.

47.      Changes in technologies, business models, and consumer lifestyles are converging to propel

the rise of online video and fundamentally transform TV, advertising, and content delivery methods.

A major recent trend in delivery of digital online content is the development of "Over-the-Top"

(OTT) delivery of content (such as movies, television, and other media) over the Internet. OTT

delivery is done through an ordinary Internet connection that is not tied to the type of content being

delivered. In the OTT model, an Internet service provider is responsible only for ensuring that data

can be received by the consumer through a provided Internet connection. Over-the-Top services

bypass traditional distribution channels like cable and satellite by providing their content "over the

top" of broadband networks.

48.      OTT content, including OTT content delivered by Apple, can often be viewed on a myriad of

connected devices, such as televisions, gaming consoles, personal computers, tablets, smartphones,

and many other connected devices. OTT services are the catalyst for much of the growth in

consumption of online video and other online digital content.

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

49.     To avoid having OTT services erode potential digital media revenue, content providers and viewing devices must provide ways to secure access to the content, including Digital Rights Management (DRM), authentication, and parental controls. Advances in DRM have enabled content owners and distributors to securely distribute online video and protect playback across devices and platforms. This increased security and level of control has, in turn, helped establish online video as a viable revenue source and led to the proliferation of business models, including digitally delivered rentals, subscriptions, and downloads. Digital security mechanisms have thus permitted the migration of video to OTT delivery.

50.     Over the last few years, software ecosystems have been emerging as a significant part of the mobile domain. The marketplaces of these software ecosystems, including Apple's iTunes Store, offer currently hundreds of thousands of applications or "apps" from tens of thousands of developers, and the ecosystems are in a tight competition. These app stores are digital distribution platforms for application software often provided as a component of an operating system on a desktop, smartphone, or tablet. Users can browse through different categories and genres of applications, purchase them (if necessary), and then automatically download and install the application on their connected device. To protect app stores as a revenue source, applications must be provided in a secure manner and verified before they are executed.

51.     The proliferation of a wider variety of devices—such as mobile computing devices—for viewing rich OTT content has created another new set of challenges relating to presentation of content in a user-friendly way. For example, users now expect to be able to access a wide range of TV and online content, including some premium content, through multiple platforms such as TVs, personal computers, and mobile computing devices, while content providers and advertisers seek to provide content across multiple platforms without compromising security and control. Additionally, for services such as streaming audio, users may expect a richer presentation of information than simply the audio stream alone.

52.     Over the past 20 years, Plaintiffs and other companies within The Kudelski Group have developed many of the underlying technologies that consumer electronics companies, such as Apple, are integrating into their products and services, in order to deliver high quality media content and

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

applications to a growing number of consumer devices. For example, Plaintiffs' portfolios include numerous patents directed to fundamental technologies for video and content management, distribution, information acquisition, sharing, authentication, secure storage, and control.

53. Plaintiffs have been, and remain, industry leaders in developing the technologies required to overcome the significant technical challenges to permit the tremendous growth of digital video content and consumption. Their investments in technology leadership and reputations as technology innovators are harmed by ongoing unauthorized use of their technologies.

### A. FIRST CLAIM FOR RELIEF

#### 1. Infringement of U.S. Patent No. 6,148,081

54. Plaintiffs incorporate by reference paragraphs 1 through 53.

55. OpenTV, Inc. is the owner by assignment of all rights, title, and interest in the '081 Patent.

56. The '081 Patent is valid and enforceable.

57. Apple has infringed, and is currently infringing, the '081 Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing into the United States, without authority, products, equipment, software and/or services that practice one or more claims of the '081 Patent, including without limitation Apple iOS and Mac OS X devices and iTunes software for the Windows operating system, designed to facilitate iTunes movie rental downloads.

58. Apple has knowledge of the '081 Patent and Apple's infringement of the '081 Patent since at least, and through, the filing and service of this Complaint and despite this knowledge continues to infringe. Apple was publicly touting its participation in the movie rental market at least in 2008. Apple would be aware of a prominent portfolio such as that of The Kudelski Group, as this portfolio is well-known in the industry. OpenTV, Inc., has asserted patents from its portfolio where appropriate against infringers. For example, in January 2014, OpenTV, Inc. and Cisco Systems, Inc. successfully ended litigation when The Kudelski Group and Cisco entered a well-publicized license agreement. Furthermore, Apple and OpenTV, Inc. are currently involved in ongoing patent litigation in this district. *See OpenTV, Inc. et al v. Apple, Inc.*, 3:14-CV-1622 (N.D. Cal.). The Kudelski Group has also licensed its patent portfolio in April 2015 to Google, a primary Apple competitor, and to Disney. Thus, Apple is aware of The Kudelski Group's portfolio at least by virtue of its role

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

1    in the market, its licensing activities, the ongoing litigation, and the impact of The Kudelski Group's

2    portfolio on Apple's products. Despite this knowledge, on information and belief, Apple continued

3    its infringing activities despite an objectively high likelihood that its activities constituted

4    infringement of a valid patent, and this risk was either known or so obvious that it should have been

5    known to Apple. Thus, on information and belief, Apple's infringement has been, and continues to

6    be, willful and deliberate.

7    59.    Apple induces third-parties, including customers, to infringe the '081 Patent in violation of

8    35 U.S.C. 271(b) by encouraging and facilitating them to perform actions that Apple knows to be

9    acts of infringement of the '081 Patent. Upon information and belief, Apple knows that the use of its

10    software designed to facilitate iTunes movie rental and playback transactions constitutes

11    infringement of the '081 Patent. Upon information and belief, Apple publishes specifications and

12    promotional literature encouraging users of iTunes devices to operate the infringing movie rental

13    functionality in its iOS and Mac OS X devices and Windows devices running iTunes. Apple creates

14    and/or distributes user manuals for the iPhone 6 and 6 Plus devices that provide instruction and/or

15    encourage infringing use, and offers support and/or technical assistance to its customers that provide

16    instructions on and/or encourage infringing use. For example, Apple publishes online documentation

17    at https://support.apple.com/en-us/HT201611, including a "About renting movies from the iTunes

18    Store" page that encourages users to use the movie rental features which infringe the '081 patent

19    when operated on an accused product. Apple's customers then directly or jointly infringe the '081

20    Patent.

21    60.    Apple also contributes to the infringement of the '081 Patent in violation of 35 U.S.C.

22    § 271(c). Apple contributes to infringement of the '081 Patent by making, using, selling, offering to

23    sell and/or importing software components incorporated with third party hardware (to the extent

24    iTunes rentals are performed on iTunes running on a Windows operating system with non-Apple

25    hardware) to facilitate iTunes movie rental downloads with knowledge that use of that software in

26    conjunction the third party hardware would infringe the '081 Patent. The accused software

27    components constitute a material part of the invention claimed by the '081 Patent at least because

28    such software components working in conjunction with the hardware are specifically programmed to

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

operate in a manner that infringes the '081 Patent. The accused software components are separable from Apple's products and are not staple articles or commodities of commerce suitable for substantial non-infringing use because these software components necessarily operate in a manner that infringes the '081 Patent. Moreover, Apple publishes information about infringing aspects of its iTunes movie rental download system that are practiced using the software components that Apple provides. Therefore, Apple is also contributing to the direct infringement of the '081 Patent by users of these products.

61.     OpenTV, Inc. has suffered and continues to suffer damages and irreparable harm as a result of Apple's past and ongoing infringement.

62.     Unless Apple's infringement is permanently enjoined, OpenTV, Inc. will continue to be damaged and irreparably harmed.

**B.      SECOND CLAIM FOR RELIEF**

**1.      Infringement of U.S. Patent No. 6,233,736**

63.     Plaintiffs incorporate by reference paragraphs 1 through 53.

64.     OpenTV, Inc. is the owner by assignment of all rights, title, and interest in the '736 Patent.

65.     The '736 Patent is valid and enforceable.

66.     Apple has infringed, and is currently infringing, the '736 Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing into the United States, without authority, products, equipment, software and/or services that practice one or more claims of the '736 Patent, including without limitation Apple's iTunes Store, designed to provide information services to a user while viewing or listening to a video or audio program on an iOS or Mac OS X product, or a Windows product running iTunes software.

67.     Apple has knowledge of the '736 Patent and Apple's infringement of the '736 Patent since at least, and through, the filing and service of this Complaint and despite this knowledge continues to infringe. Apple has been aware of the '736 patent since it cited a member of the '736 patent's European family, WO 97/29591, during nullity proceedings against the German counterpart DE 697 06 036.5 of the European Patent 0 855 525.  *See* Bundespatentgericht (Fed. Pat. Ct.) BPatG 5Ni51/14 (EP) (filed Dec. 11, 2014).  Also, more generally, Apple was publicly touting its

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

participation in the online information services content market at least in 2010 and had entered the

market at least by 2003, with the release of the iTunes Music Store. Apple would be aware of a

prominent portfolio such as that of The Kudelski Group as this portfolio is well-known in the

industry. OpenTV, Inc. has asserted patents from its portfolio where appropriate against infringers.

For example, in January 2014, OpenTV, Inc. and Cisco Systems, Inc. successfully ended litigation

when The Kudelski Group and Cisco entered a well-publicized license agreement. Furthermore,

Apple and OpenTV, Inc. are currently involved in ongoing patent litigation in this district.  *See*

*OpenTV, Inc. et al v. Apple, Inc.*, 3:14-CV-1622 (N.D. Cal.). The Kudelski Group has also licensed

its patent portfolio in April 2015 to Google, a primary Apple competitor, and to Disney.  Thus,

Apple is aware of The Kudelski Group's portfolio at least by virtue of its role in the market, its

licensing activities, the ongoing litigation, and the impact of The Kudelski Group's portfolio on

Apple's products.  Despite this knowledge, on information and belief, Apple continued its infringing

activities despite an objectively high likelihood that its activities constituted infringement of a valid

patent, and this risk was either known or so obvious that it should have been known to Apple. Thus,

on information and belief, Apple's infringement has been, and continues to be, willful and

deliberate.

68.     Apple induces third-parties, including customers, to infringe the '736 Patent in violation of

35 U.S.C. 271(b) by encouraging and facilitating them to perform actions that Apple knows to be

acts of infringement of the '736 Patent. Upon information and belief, Apple knows that the use of its

software designed to facilitate providing information services through iTunes constitutes

infringement of the '736 Patent. Upon information and belief, Apple publishes specifications and

promotional literature encouraging users of iTunes to operate it in an infringing manner.  Apple

provides instruction and/or encourages infringing use, and offers support and/or technical assistance

to its customers that provide instructions on and/or encourage infringing use. For example, Apple

publishes online documentation at http://www.apple.com/support/itunes that encourages users to

view or listen to content while receiving direct access to online information and infringe the '736

patent on an accused product. Apple's customers then directly or jointly infringe the '736 Patent.

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

69.     Apple also contributes to the infringement of the '736 Patent in violation of 35 U.S.C. § 271(c). Apple contributes to infringement of the '736 Patent by making, using, selling, offering to sell and/or importing software components incorporated with third party content downloaded on one or more Apple iOS, Mac OS X, or Windows devices to facilitate the download and streaming within iTunes with knowledge that use of that software would infringe the '736 Patent. The accused software components constitute a material part of the invention claimed by the '736 Patent at least because such software components working in conjunction with third party content are specifically programmed to operate in a manner that infringes the '736 Patent by allowing content to be downloaded and streamed one or more Apple iOS, Mac OS X, and/or Windows devices. The accused software components are separable from Apple's products and are not staple articles or commodities of commerce suitable for substantial non-infringing use because these software components necessarily operate in a manner that infringes the '736 Patent. Moreover, Apple publishes information about infringing aspects of its iTunes Store that are practiced using the software components that Apple provides. Therefore, Apple is also contributing to the direct infringement of the '736 Patent by users of these products.

70.     OpenTV, Inc. has suffered and continues to suffer damages and irreparable harm as a result of Apple's past and ongoing infringement.

71.     Unless Apple's infringement is permanently enjoined, OpenTV, Inc. will continue to be damaged and irreparably harmed.

**C.      THIRD CLAIM FOR RELIEF**

**1.      Infringement of U.S. Patent No. 7,055,169**

72.     Plaintiffs incorporate by reference paragraphs 1 through 53.

73.     OpenTV, Inc. is the owner by assignment of all rights, title, and interest in the '169 Patent.

74.     The '169 Patent is valid and enforceable.

75.     Apple has infringed, and is currently infringing, the '169 Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing into the United States, without authority, products, equipment, software and/or services that practice one or more claims of the '169

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

Patent, including without limitation Apple's iTunes Store, designed to facilitate the streaming of content as part of an interactive television system to an iOS or Mac OS X product.

76.     Apple has knowledge of the '169 Patent and Apple's infringement of the '169 Patent since at least, and through, the filing and service of this Complaint and despite this knowledge continues to infringe. The '169 patent was cited by the Examiner at the United States Patent and Trademark Office during prosecution of one of Apple's own patents, namely U.S. Patent No. 7,716,166, filed Jan. 7, 2007, titled "Method and Apparatus for Simplifying the Decoding of Data," assigned to Apple Inc.  Furthermore, Apple was publicly touting its participation in the streaming content market at least in 2010 and had entered the market at least by 2007, with the release of the iPhone. Apple would be aware of a prominent portfolio such as that of The Kudelski Group as this portfolio is well-known in the industry. OpenTV, Inc. has asserted patents from its portfolio where appropriate against infringers. For example, in January 2014, OpenTV, Inc. and Cisco Systems, Inc. successfully ended litigation when The Kudelski Group and Cisco entered a well-publicized license agreement. Furthermore, Apple and OpenTV, Inc. are currently involved in ongoing patent litigation in this district.  *See OpenTV, Inc. et al v. Apple, Inc.*, 3:14-CV-1622 (N.D. Cal.). The Kudelski Group has also licensed its patent portfolio in April 2015 to Google, a primary Apple competitor, and to Disney.  Thus, Apple is aware of The Kudelski Group's portfolio at least by virtue of its role in the market, its licensing activities, the ongoing litigation, and the impact of The Kudelski Group's portfolio on Apple's products.  Despite this knowledge, on information and belief, Apple continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or so obvious that it should have been known to Apple. Thus, on information and belief, Apple's infringement has been, and continues to be, willful and deliberate.

77.     Apple induces third-parties, including customers, to infringe the '169 Patent in violation of 35 U.S.C. 271(b) by encouraging and facilitating them to perform actions that Apple knows to be acts of infringement of the '169 Patent. Upon information and belief, Apple knows that the use of its software designed to facilitate streaming of content through iTunes constitutes infringement of the '169 Patent. Upon information and belief, Apple publishes specifications and promotional

literature encouraging users of iOS devices to operate the infringing iTunes streaming functionality in the marketing material it creates. Apple also distributes user manuals for the iOS devices and the Mac OS X devices that provide instruction and/or encourage infringing use, and offers support and/or technical assistance to its customers that provide instructions on and/or encourage infringing use. For example, Apple publishes online documentation at http://www.apple.com/itunes/ that encourages users to stream content and infringe the '169 patent on an accused product. Apple's customers then directly or jointly infringe the '169 Patent.

78.     Apple also contributes to the infringement of the '169 Patent in violation of 35 U.S.C. § 271(c). Apple contributes to infringement of the '169 Patent by making, using, selling, offering to sell and/or importing software components incorporated with third party content downloaded on one or more Apple iOS and Mac OS X devices to facilitate the download and streaming within iTunes with knowledge that use of that software would infringe the '169 Patent. The accused software components constitute a material part of the invention claimed by the '169 Patent at least because such software components working in conjunction with third party content are specifically programmed to operate in a manner that infringes the '169 Patent by allowing content to be downloaded and streamed to one or more Apple iOS and/or Mac OS X devices. The accused software components are separable from Apple's products and are not staple articles or commodities of commerce suitable for substantial non-infringing use because these software components necessarily operate in a manner that infringes the '169 Patent. Moreover, Apple publishes information about infringing aspects of its iTunes Store that are practiced using the software components that Apple provides. Therefore, Apple is also contributing to the direct infringement of the '169 Patent by users of these products.

79.     OpenTV, Inc. has suffered and continues to suffer damages and irreparable harm as a result of Apple's past and ongoing infringement.

80.     Unless Apple's infringement is permanently enjoined, OpenTV, Inc. will continue to be damaged and irreparably harmed.

### D.   FOURTH CLAIM FOR RELIEF

#### 1.   Infringement of U.S. Patent No. 7,644,429

81.   Plaintiffs incorporate by reference paragraphs 1 through 53.

82.   Nagra France is the owner by assignment of all rights, title, and interest in the '429 Patent.

83.   The '429 Patent is valid and enforceable.

84.   Apple has infringed, and is currently infringing, the '429 Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing into the United States, without authority, products, equipment, software and/or services that practice one or more claims of the '429 Patent, including without limitation Apple's iOS and Mac OS X devices which include Apple iTunes software designed to facilitate subscriber management and authorization for conditional access to information and content.

85.   Apple has knowledge of the '429 Patent and Apple's infringement of the '429 Patent since at least, and through, the filing and service of this Complaint and despite this knowledge continues to infringe. Apple was publicly touting the fact that its iOS and Mac OS X devices include iTunes functionality at least since the introduction of the iPhone in 2007 and the introduction of the iTunes Store for Mac OS X in 2003.  Apple would be aware of a prominent portfolio such as that of The Kudelski Group as this portfolio is well-known in the industry. OpenTV, Inc. has asserted patents from its portfolio where appropriate against infringers. For example, in January 2014, OpenTV, Inc. and Cisco Systems, Inc. successfully ended litigation when The Kudelski Group and Cisco entered a well-publicized license agreement. Furthermore, Apple and OpenTV, Inc. are currently involved in ongoing patent litigation in this district.  *See OpenTV, Inc. et al v. Apple, Inc.*, 3:14-CV-1622 (N.D. Cal.). The Kudelski Group has also licensed its patent portfolio in April 2015 to Google, a primary Apple competitor, and to Disney.  Thus, Apple is aware of The Kudelski Group's portfolio at least by virtue of its role in the market, its licensing activities, the ongoing litigation, and the impact of The Kudelski Group's portfolio on Apple's products.  Despite this knowledge, on information and belief, Apple continued its infringing activities despite an objectively high likelihood that its activities constituted infringement of a valid patent, and this risk was either known or so obvious that

1   it should have been known to Apple. Thus, on information and belief, Apple's infringement has

2   been, and continues to be, willful and deliberate.

3   86.      Apple induces third-parties, including customers, to infringe the '429 Patent in violation of

4   35 U.S.C. 271(b) by encouraging and facilitating them to perform actions that Apple knows to be

5   acts of infringement of the '429 Patent. Upon information and belief, Apple knows that the use of its

6   software designed to facilitate downloading of video content constitutes infringement of the '429

7   Patent. Upon information and belief, Apple publishes specifications and promotional literature

8   encouraging users of iTunes to connect their devices to a network so as to request and receive

9   content from the iTunes Store. Apple creates and/or distributes user manuals for iTunes that provide

10  instruction and/or encourage infringing use, and offers support and/or technical assistance to its

11  customers that provide instructions on and/or encourage infringing use. For example, Apple

12  publishes online documentation at https://www.apple.com/support/itunes/ including pages titled

13  "Downloading Content," "Sharing and Managing Content," and "Get to know iTunes" identifying

14  and describing the iTunes Store video download functionality, and encouraging users to use it. Thus,

15  Apple's customers directly or jointly infringe the '429 Patent.

16  87.      Apple also contributes to the infringement of the '429 Patent in violation of 35 U.S.C.

17  § 271(c). Apple contributes to infringement of the '429 Patent by making, using, selling, offering to

18  sell and/or importing software components incorporated with third party hardware (such as non-

19  Apple hardware running iTunes) to utilize the video download functionality in iTunes with

20  knowledge that use of that software in conjunction the third party hardware would infringe the '429

21  Patent. The accused software components constitute a material part of the invention claimed by

22  the '429 Patent at least because such software components working in conjunction with the hardware

23  running iTunes and are specifically programmed to operate in a manner that infringes the '429

24  Patent. The accused software components are separable from Apple's products and are not staple

25  articles or commodities of commerce suitable for substantial non-infringing use because these

26  software components necessarily operate in a manner that infringes the '429 Patent. Moreover,

27  Apple publishes information about infringing aspects of its iTunes video downloading system that

28

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

1    are practiced using the iTunes software components that Apple provides. Therefore, Apple is also

2    contributing to the direct infringement of the '429 Patent by users of these products.

3    88.    Nagra France has suffered and continues to suffer damages and irreparable harm as a result

4    of Apple's past and ongoing infringement.

5    89.    Unless Apple's infringement is permanently enjoined, Nagra France will continue to be

6    damaged and irreparably harmed.

7    **E.    FIFTH CLAIM FOR RELIEF**

8    **1.    Infringement of U.S. Patent No. 7,725,740**

9    90.    Plaintiffs incorporate by reference paragraphs 1 through 53.

10   91.    Nagravision is the owner by assignment of all rights, title, and interest in the '740 Patent.

11   92.    The '740 Patent is valid and enforceable.

12   93.    Apple has infringed, and is currently infringing, the '740 Patent in violation of 35 U.S.C.

13   § 271(a) by making, using, selling, offering for sale, and/or importing into the United States, without

14   authority, products, equipment, software and/or services that practice one or more claims of the '740

15   Patent, including without limitation Apple's iPhone, iPad, and iPod Touch line of products.

16   94.    Apple has knowledge of the '740 Patent and Apple's infringement of the '740 Patent since at

17   least, and through, the filing and service of this Complaint and despite this knowledge continues to

18   infringe. Apple was publicly touting its participation in the secure mobile device market at least in

19   2010 and had entered the market at least by 2007. Apple would be aware of a prominent portfolio

20   such as that of The Kudelski Group as this portfolio is well-known in the industry. OpenTV, Inc. has

21   asserted patents from its portfolio where appropriate against infringers. For example, in January

22   2014, OpenTV, Inc. and Cisco Systems, Inc. successfully ended litigation when The Kudelski Group

23   and Cisco entered a well-publicized license agreement. Furthermore, Apple and Nagravision are

24   currently involved in ongoing patent litigation in this district. *See OpenTV, Inc. et al v. Apple, Inc.*,

25   3:14-CV-1622 (N.D. Cal.). The Kudelski Group has also licensed its patent portfolio in April 2015

26   to Google, a primary Apple competitor, and to Disney.  Thus, Apple is aware of The Kudelski

27   Group's portfolio at least by virtue of its role in the market, its licensing activities, the ongoing

28   litigation, and the impact of The Kudelski Group's portfolio on Apple's products.  Despite this

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

1    knowledge, on information and belief, Apple continued its infringing activities despite an objectively

2    high likelihood that its activities constituted infringement of a valid patent, and this risk was either

3    known or so obvious that it should have been known to Apple. Thus, on information and belief,

4    Apple's infringement has been, and continues to be, willful and deliberate.

5    95.     Apple induces third-parties, including customers, to infringe the '740 Patent in violation of

6    35 U.S.C. 271(b) by encouraging and facilitating them to perform actions that Apple knows to be

7    acts of infringement of the '740 Patent. Upon information and belief, Apple knows that the use of its

8    operating software designed to securely boot and generate root keys constitutes infringement of

9    the '740 Patent. Upon information and belief, Apple publishes promotional literature describing the

10   secure nature of its iOS operating system for mobile devices, and offers support and/or technical

11   assistance to its customers that provide instructions on and/or encourage infringing use. For

12   example, Apple publishes online documentation at

13   https://www.apple.com/iphone/business/it/security.html, including the "iOS Security Guide" located

14   at https://www.apple.com/br/privacy/docs/iOS_Security_Guide_Oct_2014.pdf, describing the secure

15   boot process included in iOS.  Thus, Apple and its customers then directly or jointly infringe

16   the '740 Patent.

17   96.     Apple also contributes to the infringement of the '740 Patent in violation of 35 U.S.C.

18   § 271(c). Apple contributes to infringement of the '740 Patent by making, using, selling, offering to

19   sell and/or importing software components incorporated with third party hardware utilized by one or

20   more Apple iOS devices to facilitate the secure boot process with knowledge that this process would

21   infringe the '740 Patent. The accused software components constitute a material part of the invention

22   claimed by the '740 Patent at least because such software components working in conjunction with

23   the iOS devices are specifically programmed to operate in a manner that infringes the '740 Patent by

24   allowing for generation of root keys during the secure boot process on iOS. The accused software

25   components are separable from Apple's products and are not staple articles or commodities of

26   commerce suitable for substantial non-infringing use because these software components necessarily

27   operate in a manner that infringes the '740 Patent. Moreover, Apple publishes information about

28   infringing aspects of its iOS operating system that are practiced using the software components that

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

1    Apple provides. Therefore, Apple is also contributing to the direct infringement of the '067 Patent

2    by users of these products.

3    97.    Nagravision has suffered and continues to suffer damages and irreparable harm as a result of

4    Apple's past and ongoing infringement.

5    98.    Unless Apple's infringement is permanently enjoined, Nagravision will continue to be

6    damaged and irreparably harmed.

7    **V.     REQUEST FOR RELIEF**

8    99.    Plaintiffs respectfully ask that the Court enter judgment in their favor as follows:

9          a) finding that Apple has infringed each of the Asserted Patents;

10         b) finding that each of the Asserted Patents is not invalid and is enforceable;

11         c) awarding Plaintiffs damages adequate to compensate for Apple's infringement, but in no

12         event less than a reasonable royalty;

13         d) awarding an accounting and supplemental damages for those acts of infringement

14         committed by Apple subsequent to the discovery cut-off date in this action through the date

15         Final Judgment is entered;

16         e) finding that this case is exceptional;

17         f) awarding Plaintiffs their attorneys' fees and costs, together with pre-judgment and post-

18         judgment interest;

19         g) permanently enjoining Apple and its parents, subsidiaries, affiliates, officers, directors,

20         agents, servants, employees, successors and assigns and all others in active concert or

21         participation with any of the foregoing from any further acts of infringement, including

22         contributing to and/or inducing infringement, of the Asserted Patents;

23         h) finding that Apple's infringement of the Asserted Patents has been willful;

24         i)  ordering that damages for infringement of the Asserted Patents be trebled as provided for

25         by 35 U.S.C. § 284 for Apple's willful infringement of the Asserted Patents; and

26         j) awarding any other relief the Court deems to be just and proper.

27         //

28         //

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

1

Respectfully submitted,

2

Dated: May 5, 2015

FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.

3

By: */s/ Robert F. McCauley*

4

Robert F. McCauley

5

*Attorneys for Plaintiffs*

6

OpenTV, Inc., Nagravision S.A., and Nagra France
S.A.S.

7

8

**DEMAND FOR JURY TRIAL**

9

Plaintiff hereby demands a trial by jury to decide all issues so triable in this case.

10

Dated: May 5, 2015

FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.

11

12

By: */s/ Robert F. McCauley*

13

Robert F. McCauley (SBN 162056)

14

robert.mccauley@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP

15

3300 Hillview Avenue

16

Palo Alto, CA 94304-1203
Telephone:     (650) 849-6600

17

Facsimile:     (650) 849-6666

18

Gerald F. Ivey (*pro hac vice* to be filed)
Smith R. Brittingham IV (*pro hac vice* to be filed)

19

Elizabeth A. Niemeyer (*pro hac vice* to be filed)
John M. Williamson (*pro hac vice* to be filed)

20

Aidan C. Skoyles (*pro hac vice* to be filed)
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP

21

901 New York Avenue, NW

22

Washington, DC 20001-4413
Telephone:     (202) 408-4000

23

Facsimile:     (202) 408-4400

24

Stephen E. Kabakoff (*pro hac vice* to be filed)
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP

25

3500 SunTrust Plaza

26

303 Peachtree Street, N.E.
Atlanta, GA 30308-3263

27

Telephone:     (404) 653- 6400
Facsimile:     (404) 653-6444

28

- 26 -

COMPLAINT FOR PATENT INFRINGEMENT
Case No.

*Attorneys for Plaintiffs*
OpenTV, Inc., Nagravision S.A., and Nagra France
S.A.S.

COMPLAINT FOR PATENT INFRINGEMENT
Case No.